**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

August 21, 2026

The Honorable Robert W. Lehrburger
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007-1312

**Re: *United States v. Larry Montes*, 26 Cr. 3367**

Dear Judge Lehrburger:

The Government respectfully submits this letter in support of its request that defendant Larry Montes be detained pending trial. The defendant—who is currently detained on state charges related to the same incident charged here—was taken into federal custody this morning following a violent, hate-motivated attack at Shabbat service attended by hundreds of people at the Central Synagogue in Manhattan (the "Synagogue") on Friday, August 14, 2026. During the attack, the defendant punched a woman in her face, headbutted a security guard and called him a racial slur, and damaged valuable religious property. When the defendant was arrested for the attack, he stated an intention to return to the Synagogue. For the reasons described below, there are no conditions that can reasonably be expected to ensure the safety of the community or assure the defendant's appearance in court if the defendant were released.

## I. Background

### A. Montes's August 14, 2026 Attack at the Central Synagogue

On August 14, 2026, a Friday night Shabbat service attended by approximately 375 people took place at the Synagogue. Approximately nine minutes into the service, the defendant, who was sitting in one of the rows, stood up and began shouting, "you know who the fuck I am." He then approached the stage and physically struck with his arm two ceremonial silver candlesticks with gold accents, estimated to be worth thousands of dollars each. The candlesticks fell to the ground and were damaged. (Compl. ¶ 5(a)).

The head of security at the Synagogue then attempted to physically restrain the defendant by wrapping his arms around him and attempted to remove him from the area where services were taking place. The defendant shouted, among other things, "fuck you people" and "I don't fuck with you people." The defendant also, while being restrained, and without provocation, punched with a closed fist a woman in her sixties ("Victim-1") who was attending services at the Synagogue. The defendant's punch bruised the left side of Victim-1's face, gave her a bloody lip,

and caused her to fall to the ground, where she sustained a laceration to her forearm. (*Id.* ¶ 5(b)). A picture of Victim-1 with these injuries is below[1]:

[redacted]

Once the head of security brought the defendant to the lobby of the Synagogue, additional security guards, including a Black male security guard ("Victim-2") and a New York City Police Department ("NYPD") officer stationed outside the Synagogue proceeded to handcuff and arrest the defendant. While the defendant was being handcuffed, he looked at Victim-2, and stated, in sum and substance, "fuck you [n-word]." He then spat in Victim-2's face and headbutted Victim-2 near Victim-2's left eye socket, resulting in pain to Victim-2's face that lasted for hours. (*Id.* ¶ 5(c)).

While being arrested, the defendant also stated that he planned to return to the Synagogue at a later date. (*Id.*).

### B. Montes's Post Arrest Statements

Following his arrest, the defendant participated in a *Mirandized* interview with NYPD officers. During the interview, the defendant stated "fuck the Jews. . . . It's racial" and "I will never affiliate with no filthy fucking synagogues, either here or in fucking Israel."[2] The defendant further explained his actions as that he felt disrespected at the service so "got up, start[ed] some shit, [and] smacked somebody around." When asked by the NYPD officers why he felt disrespected, the defendant stated that "it's all a racial thing" and that it was "all religious motivated." When asked by the NYPD officers why the defendant had called Victim-2 a racial slur, the defendant stated "Listen, I have racial issues. Okay, I'm straight to the point." (*Id.* ¶ 6).

### C. Montes's Other Arrests

In addition to his arrest for the above captioned conduct, the defendant has prior

[1] The Government respectfully requests to file a redacted version of this detention letter, redacting the photograph of Victim-1 to protect Victim-1's privacy.

[2] The defendant also noted that he identified as Jewish.

convictions and arrests involving violent or threatening conduct.

- **July 4, 2023 Theft:** According to law enforcement records from the NYPD, on July 4, 2023, in Manhattan, the defendant entered a store and removed items from the shelf. When approached by store security the defendant displayed a knife, stated, "now what," fled with the property, and was later arrested. The defendant was incarcerated for this conduct from approximately July 5, 2023 to January 9, 2024. The defendant pleaded guilty to petit larceny, a class A misdemeanor, related to this conduct, and was sentenced on June 12, 2026—*i.e.,* approximately two months before his conduct in this case—to time served.

- **July 16, 2019 Theft/Assault:** According to law enforcement records from the NYPD, the defendant was arrested in Manhattan on July 16, 2019 for removing items from a store shelf and, while proceeding to exit, punching an individual with a closed fist multiple times on the head and then fleeing. The defendant eventually pleaded guilty to petit larceny, a class A misdemeanor, related to this conduct, and was sentenced on July 31, 2019 to thirty days' imprisonment.

- **May 23, 2019 Assault:** According to law enforcement records and municipal court records, the defendant was arrested on May 23, 2019 in New Jersey for simple assault—purposely/knowingly causing bodily injury. That case appears to be pending, and a bench warrant was issued for the defendant in approximately 2021.

### D. Procedural History

The defendant was arrested on August 14, 2026 and charged in New York Criminal Court on August 15, 2026 with state law hate crime offenses, aggravated harassment in the first degree, and aggravated harassment in the second degree. Bail was set for $10,000 cash, a $30,000 insured bond, and a $30,000 partially secured surety bond. The defendant has not yet posted bail in connection with that offense and has been held in state custody until he was taken into federal custody this morning.

On August 18, 2026, a federal Complaint was issued against the defendant, charging him with three counts. Two counts are for committing federal hate crimes, in violation of 18 U.S.C. § 249. Count One charges the assault against Victim-1 and Count Two charges the assault against Victim-2. In the third count, the defendant is charged with damage to religious property resulting in bodily injury, in violation of 18 U.S.C. § 247(c) and (d)(3).

## II. Legal Standard

Under the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e). A finding of risk of flight must be supported by a preponderance of the evidence. *See*, *e.g.*, *United States v. Jackson*, 823 F.2d 4, 5 (2d Cir. 1987); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985). A finding of

dangerousness must be supported by clear and convincing evidence. *See*, *e.g.*, *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995); *Chimurenga*, 760 F.2d at 405.

Counts One and Two here constitute a crime of violence as defined in the Bail Reform Act. *See* 18 U.S.C. §§ 3142(f)(1)(A) and 3156(a)(4); *see United States v. Howald*, 104 F.4th 732, 742 (9th Cir. 2024) (classifying Section 249 as a crime of violence when considering defendant's motion to dismiss a count charging 18 U.S.C. § 924(c)); *United States v. Sotelo*, 16 Cr. 10062 (JTM), 2016 WL 7373921, at *1 (D. Kan. Dec. 20, 2016) (classifying Section 249 as a crime of violence for bail purposes); *United States v. Hammet*, 13 Cr. 11 (JAM), 2013 WL 1192779, at *3 (E.D. Cal. Mar. 22, 2013) (same). The Court can—and should—consider that the charges include multiple crimes of violence in evaluating the defendant's dangerousness. *See United States v. Balde*, No. 16 CR. 130 (KPF), 2020 WL 1673247, at *3 (S.D.N.Y. Apr. 6, 2020) (noting that in determining bail, the Court is required to consider, among other things, "whether the offense is a crime of violence").

In determining whether the defendant is entitled to bail, the Court considers the factors set forth in 18 U.S.C. § 3142(g). These factors are: (1) the nature and circumstances of the offense, including whether the offense is a crime of violence; (2) the weight of the evidence against the person; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. Where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1). As set forth below, all four factors weigh heavily against release in this case.

## III. The Defendant Should Be Detained

Based on the facts detailed above—including the defendant's vicious assaults against Victim-1 and Victim-2, his stated animus against Jews and Black people, and his criminal history—the defendant poses a serious danger to the community. In particular, the defendant poses a serious risk of danger to the Synagogue and those who work there and attend its services. And given the defendant's criminal exposure, and the strength of the evidence against him, the defendant poses a flight risk as well. The Government therefore moves for the defendant to be detained pending resolution of the charges.

### A. Nature and Circumstances of the Charged Offenses

The nature of the charged hate crimes is extremely serious and weighs in favor of detention. The defendant violently disrupted a religious service attended by hundreds of individuals due to self-proclaimed religious and racial biases against Jewish people. The defendant not only destroyed valuable religious property, but he punched a congregant, a female in her sixties, without any provocation, leaving her bruised and bleeding. The defendant's actions created terror in the hearts of the congregants and damaged the sense of safety and sanctity relied upon by the hundreds of congregants gathered for peaceful worship.

The defendant's conduct around the time of and after his arrest only underscores the gravity of the offense. While multiple people were trying to arrest him, the defendant—due to his self-

proclaimed racial issues—spat and headbutted a Black security guard, after hurling a racist verbal epithet. The defendant also made statements after he was arrested evincing that he committed the attack for hate-related motivations. Violent crimes driven by this kind of animus demonstrate a severe disregard for the law and cause serious harm to the individual victims and the community at large. It is also precisely this type of conduct from which the public needs to be protected.

**B. Weight of The Evidence**

The proof of the charged offenses is overwhelming. The defendant's destruction of property and assaults were witnessed by many bystanders, portions of the incident were captured on video, and the defendant was immediately arrested at the scene. Evidence of the defendant's motivation for conducting the attacks—namely his anti-Semitic and anti-Black animus—is likewise overwhelming. In addition to his actions and statements at the Synagogue, the defendant made clear repeatedly in his post arrest statement with law enforcement that he committed the attack due to racial and religious biases. He stated in his post arrested statement "fuck the Jews. . . . It's racial." He also stated that he had committed the crime because he felt disrespected and that it was "it's all a racial thing" and that it was "all religious motivated." He also stated that he called Victim-2 an anti-Black slur because "I have racial issues." This factor therefore weighs heavily in favor of detention.

**C. Defendant's History and Characteristics**

The defendant's history and characteristics also militate powerfully in favor detention. This is also not the first time that the defendant has engaged in threatening or violent conduct. The defendant has previously been arrested on several different occasions, including for punching an individual with a closed fist multiple times on the head, displaying a knife to a security guard while attempting to steal items from a store, and assault. These actions demonstrate a troubling history of violent conduct, fueled by little provocation. Concerningly, none of the defendant's arrests or convictions has deterred him from continuing to engage in violence.

**D. Danger Posed by Defendant's Release**

The defendant's actions on the night of August 14 and his statements to law enforcement after his arrest demonstrate by clear and convincing evidence that he poses a danger of physically harming others, including those he perceives as Jewish or Black. His vitriolic statements during his post-arrest make clear that his animosity towards Jews is deep-seated. The defendant also, through his statements to Victim-2 at the Synagogue, and his latter statements to law enforcement during his post arrest, clearly harbors anti-Black animosity, and has demonstrated a disturbing willingness to act on that hatred.

Moreover, the defendant poses a continued threat to the Synagogue and its congregants. Even after causing widespread fear at the Synagogue, the defendant stated an intention to return to the Synagogue at a later date. In short, given the nature of the defendant's crimes, his repeated engagement in violent, illegal activity, and the fact that prior arrests have failed to deter him, there are no conditions that can reasonably be expected to ensure the safety of the community if he were released.

**E. Montes's Risk of Flight**

The defendant should also be detained based on his risk of flight. The defendant is facing serious criminal charges and, as described above, the evidence against him is overwhelming. His potential exposure, including a potentially significant incarceratory sentence, provides him with ample incentive to flee. The defendant has also shown a willingness to flee in connection with his conduct in this case. While the head of security was attempting to restrain the defendant and remove him from the Synagogue, the defendant physically resisted. In addition, the defendant violently assaulted another officer while he was handcuffed. The defendant has also attempted to flee both in connection with his July 4, 2023 and July 16, 2019 arrests and a bench warrant is currently outstanding related to a case against him for assault in New Jersey. Under these circumstances, there is a meaningful risk that the defendant will flee in order to avoid facing these criminal charges.

**IV. Conclusion**

Given the defendant's repeated acts of violence, his antisemitic and anti-Black beliefs, which he has shown he is willing to act upon, and his statement that he planned to return to the Synagogue at a later date, there is a clear and unacceptable risk of further harm if he is released. His conduct reflects volatility, and a disregard for both lawful authority and community safety. No set of conditions can reasonably assure the protection of the public and prevent his flight. The Court should therefore order the defendant detained.

Respectfully submitted,

JAMES MCDONALD
United States Attorney

By: /s/
Meredith C. Foster
Assistant United States Attorney
212-637-2310